May it please the court, I am David Hardesty on behalf of Ms. Jackson. I would like to ask whether the trial court in determining that there was no genuine issue of fact regarding pretext went beyond what the courts position is supposed to be and intruded on the province of the jury. The question is, were the comparators that Ms. Jackson proposed, could a reasonable juror find that they were sufficiently identical in their conduct such that disparate treatment of those two people could give rise to an inference of discrimination. We're talking here about a plaintiff, Ms. Jackson, who had worked for the hospital for 13 years, never subject to any discipline, nothing more than exemplary performance evaluations. She was put into a situation where about the time that some patients were to be walked out, another patient in this, this is a psychiatric hospital, nobody in there is really in their right mind. We know what happened factually. Right. The other woman takes her clothes off and is urinating on the floor and she has to deal with that. And in that confusion, she mistakenly did not check the ID badge. The nurse had been doing the checking out, the nurse said take these people out. She didn't check the badge. She was wrong. There's no question about that. Well, the problem with her situation was that they had the huddle just that very day and said don't let them out unless you see the ID. And she didn't see the ID. And so that's right in the face of the instructions that day. Said you might be fired or something to that effect. You just can't do it. Your Honor, the problem with that is that there's a factual issue about whether that was ever communicated to Ms. Jackson. I'm sorry, please go ahead. She signed something there indicating that she was there and wasn't the warning put on the paper where she signed it? Your Honor, I don't know how many conferences that you've gone to. I'm sure there have been numerous ones. I do. Meetings where the sign-in sheet is passed around and you sign it and pass it on. How many people read what's on it? Well, there's a lot of things that you don't read that you're liable for. Like filling out some form with your credit card company or something. She testified that she immediately was called away from that huddle to deal with a patient. So she wasn't there when it was discussed. There's no evidence that she saw the page that was attached. Besides what she also testified, everybody knew that before you walked somebody out, you were supposed to check the ID. I mean, that was what Mr. Duncan had done wrong. He hadn't checked the ID. That happened months before. On the issue of the form, I mean, I think the form is important for two reasons. I mean, I guess I want to see if you agree. Number one, Ms. Jackson's culpability to the extent she saw it and then a short time later doesn't comply. But, you know, in a case where the issue is whether the employer's reason was pretextual, doesn't the fact that the employer that very morning chooses to emphasize this precise concern, isn't that powerful evidence that this is not a pretext at all? I mean, that very morning the employer emphasized how important this is. It could be, Your Honor. But isn't it important that... But isn't that really the larger import, I guess? I mean, regardless of whether she saw it. I mean, the employer that very morning emphasized this. So doesn't that make it pretty hard to say it's pretextual? Well, Your Honor, first of all, I would emphasize again that this is a factual issue. The question is not whether you or I think that the warning is sufficient. It's a question about whether a reasonable juror could. When you put that in juxtaposition with the fact that Ronald Duncan was on a final warning, on his second final warning at the time that he walked the wrong patient out without checking the ID and without even providing the crutch for the disabled person he was walking out and walked off the job in the middle of his shift that same day, and that male person was not terminated, a reasonable person could look at those two situations and say, you know, the fact that they reemphasized that you have to check the ID doesn't outweigh the fact that this was an exemplary employee who was not on a final warning, second final warning, and can find that there is reason to question the credibility of the articulated motivation. So the thrust of your argument is not that your client did not commit an infraction, but when her behavior is compared to us, other employees committed comparable or worse infractions and were treated more favorably. So the argument is not whether your client did something wrong. My question is whether for purposes of all the MacDonald-Douglas burden shifting, there were other people who did, there were comparators who did the same or worse in terms of the seriousness of the misconduct and were treated more favorably, as I understand it. That's exactly our point, Your Honor. She committed things that fell in the policy, I think it was J and Q, for serious infractions. Conduct injurious to the well-being, it's not artfully crafted, but whatever, we know what they mean there. And health and safety. Walking the wrong patient out, no question, violated both of those things. But walking the wrong patient out when it's done by Mr. Duncan also violated those same things. And he was not as an exemplary employee and was on a final warning. Not searching a patient who comes into the hospital with a waste pouch with three knives in it into a psychiatric hospital certainly has to involve health and safety. Was that Duncan as well? That was Mr. Little. That was Mr. Little who, by the way, received a verbal warning for that, even though he was on a last chance agreement. He didn't attend the huddle where they said don't do this, period, right? Don't let anybody in here with knives in a pouch or whatever it was that he found. No, there was not a specific huddle for that, Your Honor, but I don't think the hospital is going to argue that anybody knew that when searching is part of your job for intake, that looking to see if they have knives on them is part of that and is a violation. He was disciplined for that. There's no question about that. He was disciplined for that in January of 2011. Actually, for that one, he was suspended and put on final warning, but he had a previous written warning. In April of 2013, he walked a patient out improperly. The rules were that you can only take the direction of the nurse. He walked a patient out on the word of the social worker. As it turned out, it wasn't the wrong patient. He walked out the right one, but he did the wrong thing. He didn't follow the procedures. Finally, in June of 2013, Mr. Little miscoded a blood sample, certainly a safety event. For those last two things, he got verbal counseling only, again, after he'd been on written warning. It's getting a little far afield. What is the difference between the showing that you need to make for your prima facie case regarding similarly situated other employees and the pretext showing? Do you follow me? Basically, your argument as to pretext is identical to your argument as to prima facie case. It's very difficult, Your Honor, because the cases are not clear about what substantial identity and similarly situated. What are your thoughts? What should it be? What additional showing should be necessary to show pretext? I think you probably have to bring them in a little bit more closer, a little more close. They have to be, how can you say, more identical? More similar. More similar, yes. But I submit that in this case, especially with Mr. Duncan, you have sufficient similarity. Here's the question. Can a reasonable person, based on the different treatment of these two individuals, given their conduct, can a reasonable person have a suspicion that this reason is not the reason? And can it permit an inference of discrimination? And that's a jury question that should be left for the jury. Thank you. Good morning, Your Honors. Kevin Campbell on behalf of the appellee, the VHS Detroit Receiving Hospital, Inc. Your Honors, if I may just briefly touch on one issue that arose during the argument earlier. As it relates to the form in the inquiry with respect to the form signed by Ms. Jackson, I just would like to emphasize one point. And that is that Ms. Hurd's testimony that a staff, crisis center staff member who failed to attend a huddle for exigent circumstances was responsible for finding out what he or she missed. And that fact is unrebutted. I think one more point along those lines is that a plaintiff's own admissions, a plaintiff admits that she is aware of the patient identification policy. There's no question that the plaintiff committed an infraction. But what about the contention that, you know, if you compare her with Mr. Duncan, who was on final warning status for drug violations, and then he discharges the wrong patient and didn't get fired. How do you explain that differentiation? The argument being that he's being treated, the plaintiff's being treated less favorably based upon their gender. I'm sorry. Your Honor, if I may, two points. First of all, as it relates to a proposed comparator, Duncan, I respectfully submit that Ruth and Colvin are controlling here. What the district court failed to do is consider the comparable seriousness of the infractions. And I respectfully submit that Colvin and Ruth teach us that the comparable seriousness of the infractions is an important part of a similarly situated analysis. I respectfully submit that it is plaintiff's burden to establish that the comparator here, Duncan, was similarly situated and engaged in misconduct of comparable seriousness. Well, he did about the same thing, right? I'm not following your argument. There's no dispute what the nature of his infraction was, and it was comparable to hers. So what's there to prove here in terms of comparability? I'm not following your argument. I submit this, that we know Ms. Jackson mistakenly discharged a suicidal patient. We know nothing about the patient that proposed comparator Duncan released. We don't know if he had a, he or she had a. . . So what? It was a violation. It was a serious violation of the policy. It was under this K or Q category of major infractions. That's true with respect to Jackson, and that's true with respect to Duncan. I mean, the person Duncan let out could have been worse. I'm not following the argument here. Neither of them. . . Well, go ahead and make your point. I think it would be delving into speculation. We know nothing about what was afflicting the patient in the Duncan incident. So what? The patient was improperly discharged without Duncan checking the ID band, which is the violation. Now, neither Duncan nor the plaintiff or medical people who could evaluate the patient. The institution doesn't ask them to determine the seriousness before checking the armband. They're supposed to do that in every single case. Well, again, I think Ruth and Colvin teach us that it's not just the similarity of misconduct, but the consequences that matter. And here we know what the consequences were with respect to Theodore A. We don't know by the consequences. I'm not following your argument. Neither of these patients went out and killed somebody. What consequences are you talking about? Well, I think that in Colvin, of course, it's very clear that what ultimately happens is irrelevant. In other words, it's the risk imposed upon the hospital that's relevant. Potential consequences. Potential consequences, precisely. One more point, if I may, Your Honor, is with respect to the alleged proposed comparator of Duncan, it's entirely unclear whether or not adherence to the patient identification policy would have prevented that incident. For instance, with respect to Ms. Jackson, we know with certainty that adherence to the policy would have prevented it. Why? Because the discharging nurse spoke out the names of those three patients who were to be discharged. Moreover, Ms. Jackson was involved in the discharge process. She gathered the property. She was distracted, yes, but she gathered the property which had the identification labels. She knew who was to be discharged. The record's clear. And simply by adherence to the policy, she could have averted the outcome. So, I mean, she breached the policy. That's for sure. Let me ask you this question. I'm sorry, sir. Your Honor. And this is not the standard of liability in this case. It's not a trick question. But it's just sort of a practical question. I mean, a reasonable fact finder could find, couldn't they, that if the hospital was going to fire Jackson, they probably should have fired Duncan, too. Is that fair? And I'd like to finish the thought then, if I may, Your Honor. Sure. And that is, with respect to Duncan, I just articulated that with respect to Ms. Jackson, adherence to the policy would have averted the outcome. Now, with respect to Duncan, we don't know whether adherence to the policy Well, okay, let's answer my question. Okay, I'm sorry, sir. I'm sorry, Your Honor. I mean, a reasonable fact finder could find that, you know, if they were going to fire Ms. Jackson, they probably should have fired Duncan, too. I disagree, Your Honor. No reasonable fact finder could conclude that. I believe so. And this is because of Colvin and I know I'm not talking about the case. Well, I'm just Seriousness. Potential consequences. This is a suicidal patient we know nothing about. We know nothing about I mean, the conduct is identical, okay? I mean, you're not arguing here that she knew this person was suicidal when she chose to let him out, right? Quite the contrary. There's no evidence to the record. I mean, there are two different things. There's her culpability and there are the potential consequences. Displacement. The culpability is identical apart from the form business. I mean, the conduct is identical in Duncan's case. I guess, I mean, this is a hard case. It's a hard case because Duncan has a train wreck of a record and he engages in the same conduct and he doesn't get fired. And on the other hand, Ms. Jackson is warned that very morning. But I guess you don't think somebody could, I mean, one could say, well, you know what? Maybe they didn't discriminate against her, but they should have been tougher earlier with Duncan. But you're saying nobody could think Duncan should have gotten fired? Well, if the seriousness was comparable, then I think that there would be no question. What about the conduct being identical? But I think the Colvin teaches us both. It teaches us both. It's not just a similarity of the misconduct but its consequences as well. Wait a minute. What about the Ercegovic case which says that in looking at comparability, the facts don't have to be exactly the same if the situations are sufficiently similar that they can be looked at together for purposes of comparability. Although in this case it does appear that the facts were really the same in all important respects. But what about the Ercegovic case? How does that affect your argument? Your Honor, as I understand Ercegovic, it's sort of elaborated on Mitchell in that one need not be similarly situated in all relevant respects. I don't really view Ercegovic as impacting the hospital's analysis. I really truly feel that Colvin and Ruth are controlling here. Is Ercegovic talking about prima facie or pretext or both? As I understand, Your Honor, Ercegovic is prima facie. What additional showing do you think should be necessary beyond prima facie? Because, again, it's sort of basically the same evidence that's being used at two stages here. What does it take beyond prima facie? I respectfully submit that under Manzer and Teisinger that for purposes of the pretext analysis, the court must look at the prima facie, the evidence offered at the prima facie stage. It's the lack of force or the force of that evidence. It also must look at the articulated reason that's set forth by the employer and whether the probative evidence in support of that articulated business justification and any other evidence in support of the employer's position. I respectfully submit that under Teisinger and under Manzer that that is the applicable standard at the pretext stage. The only difference I see between Duncan and Jackson is that Jackson went to that huddle that morning and they said, don't be doing this. But Duncan's was even more aggravated because he was on the last warning, wasn't he? And they ought to have bumped him right then. Do you admit that? I think that in the event that he had exposed a hospital of similar severity of consequences, I think there's no question about it. And the court found that Duncan was a comparator, right? For purposes of the prima facie, yes, Your Honor. There's some suggestion in the record that the, at least I derive from the record, that perhaps the hospital didn't like to have females in this position of medical health technician because they had to deal with unhinged patients who were sometimes physically dangerous or threatening and that the plaintiff here was the only woman in that position out of, I don't know, 12 or 14 of these medical health technicians. Is that true, that she was the only woman, the only female in that particular position? That is true. If I may emphasize, Your Honor, that there's absolutely zero citation to the record with respect to the assertion that the hospital believed that females in a patient care capacity in the center. Well, there might be some circumstantial indication since they didn't maintain any females in that position except one, that one being the plaintiff wherein all the other support roles, the other nurse categories in the hospital were predominantly female. Wouldn't that be some circumstantial indication of the institution's preference? Or at least a fact finder might at least take that into consideration as a relevant persuasive factor. Your Honor, I respectfully submit that it's a non-meaningful distinction for the reason that all those involved in patient care, the nurses, the social workers. Say that again. If we look at all those involved in patient care other than MHDs, if we look at nurses, if we look at social workers, 55% of those folks were female. And so if there was a concern that women. But, I mean, as Judge Clay points out, the question for a jury if it went to one is, you know, did they discriminate against her in this position? And if, say, the other 12 people in the position are all men, you know, I mean, doesn't that provide some circumstantial evidence that they didn't want a woman in that position? I would say if there was evidence to the record that mental health technicians were the only ones with direct involvement with patients. There might be some reasonable inference might be drawn from that. Is there another position that would require the same ability to physically control, you know, a patient who's having some kind of episode? I'm sorry, Your Honor. Is there another position at the hospital that, you know, and does the record show, that would require the employee to be able to control physically a patient who is having some problem? I submit that the record evidence doesn't demonstrate who is responsible. If there's a patient who is excessively agitated or behaving violently. Okay, but certainly the technicians are. We know that just from, you know, the facts of this case, you know, and people urinating and that sort of thing. We know the technicians have to deal with it. If you're saying we don't know, the record doesn't show whether any other position at the hospital is one where those folks would have to deal with it, then I think we're left with, okay, we know one position required controlling the patients. It's this one. 12 of 13 were men. I respectfully submit that the record isn't clear that MHTs were the only classification that dealt with. But your argument was other people have interaction with patients. Precisely. Yeah, but now you're saying the record doesn't show that. Well, I think maybe I misspoke. So I'll just try to be clear. Yeah, 10 seconds because, I mean, you've largely run out of time. I'm sorry, Your Honor. Very quickly, I think that the record is very clear that MHTs are not the exclusive classification of employees who deal with mental health patients, that all of them do. All right. If there's any further questions. I believe we have your position in hand and you're out of time. Thank you, Your Honor. Your Honors, I will be brief. The citation of the Ruth and Colvin cases, I think, is completely apt. When you're talking about equating or comparing the potential consequences from the act. In the Ruth case, the plaintiff had given 10 times the proper dose of phenobarbital, which could potentially kill or paralyze the patient. The comparator... Is that completely inapt? Is that what you're saying? No, I'm saying the comparison is, in fact, apt because it shows, in Ruth, the potential consequences were very different. One was potentially killing. The comparator gave the wrong antibiotic, which had negligible consequences, I think was the word that the court used. The potential consequence of the two acts were vastly different. Well, I mean, in fairness, one could say the potential consequence of turning loose a currently suicidal patient is much larger than turning loose a patient who isn't currently suicidal. I think, Your Honor... I think each side needs to sort of recognize in fairness some things, and that would seem to be one that you have to recognize. I mean, unless you want us to stand on that line, there's no difference between turning loose a patient who's there because they're suicidal and a patient who isn't. Well, Your Honor, we didn't have access to the records, and I think it would be a violation for somebody to tell us what the condition that Mr. Duncan's patient had. He may have been homicidal. The fact is he was in a psychiatric facility for care, and very often that involves the potential of causing harm to oneself or others. I think it's also important to note that in the disciplinary proceeding and in the record of the disciplinary proceeding, there is no mention of the fact that the patient was suicidal. It doesn't appear to have entered into the reasoning at the time of termination. But the hospital faced at least potential liability that was equal in both cases, and certainly the potential liability from not searching, as little didn't, a patient who had three knives. I would submit that the potential consequences are a lot more similar in this case than they were in Ruth or in Colvin, as Judge Seiler may recall. He was on that panel where the plaintiff dispensed ten times the proper dose of a controlled substance, and the comparator was sometimes late in doing prescriptions. Again, the potential consequences were vastly different. And so Ruth and Colvin, I think, stand as good examples of what this case isn't. What is your best case? This boils down to basically you've got a strong comparator, therefore the jury could find discrimination. What's your best case that you would point to for that profile? Strong comparator, really not much else. I mean, there's really no whiff other than the 12 out of 13 are men. I'll grant you that. There's just not much of a feel. In some cases, you can just feel it. But what's your best case for a similar case, same profile, strong comparator, not much else, liability? It went to the jury. I don't have one, Your Honor. I haven't found one. And in my original argument, as I pointed out in response to your question, courts have not really given any sort of usable distinction between similarly situated and substantially identical. I'm just talking about cases where this court said it should go to trial because of the strong comparator, even though there isn't much else. Well, Manzer, and I think the language from there is important when they're talking about the rebuttals to the legitimate non-discriminatory reason. They said the two types of rebuttals and specifically the third, which is ours, is they're direct attacks on the credibility of the employee's preferred motivation for firing a plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed a suspicion of mendacity. The suspicion of mendacity itself raises the inference of discrimination because you're lying about what the reason was. That reason wasn't sufficient. Mendacity. Boy, that word just does not seem to fit well as applied to an employer who that very morning said, do not do this one thing. To say they are then mendacious for terminating somebody who did that thing that day. Well, Your Honor, they're not mendacious for disciplining her. They're certainly not. If they had suspended her, we wouldn't be here today. Okay. Thank you. Thank you. Thank you, and the case is submitted. We'll call the next case.